NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-450

GEORGE MACKIE

vs.

ROBERT JOSS.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

This case was heard together with the Mackie v. Rouse-Weir, Appeals Court Case No. 22-P-268, decided in a memorandum and order issued pursuant to Rule 23.0 on this same day. In this case, the plaintiff, George Mackie, has brought suit against the defendant, Dr. Robert Joss, a psychologist employed by the Counseling and Psychotherapy Center in Needham, who served as a Qualified Examiner (QE) in the trial at which it was determined that Mackie would be incarcerated as a sexually dangerous person (SDP). Mackie appeals a Superior Court judge's allowance of Joss's motion to dismiss. For the reasons that follow, we vacate the order of dismissal and remand. Some background about QEs and the SDP process is in order.

Background. During the incarceration of one convicted of a sexual offense, by statute the department of corrections is

required to "notify in writing the district attorney of the county where the offense occurred and the attorney general six months prior to the release of such person." G. L. c. 123A, § 12.

Under Section 12, should the district attorney or the Attorney General determine the individual is likely to be an SDP, either the district attorney, or the Attorney General at the request of the district attorney, may bring a petition on behalf of the Commonwealth alleging that the individual is an SDP, and, subsequently, as described in more detail below, a petition on behalf of the Commonwealth for the individual's commitment to the "treatment center" for up to their natural life. See Commonwealth v. Patton, 458 Mass. 119, 128 n.10 (2010) ("A person found to be sexually dangerous may be deprived of his liberty for the remainder of his life").

Under G. L. c. 123A, § 9, once per year, a committed SDP may petition for examination and discharge. See In re Johnstone, 453 Mass. 544, 548 (2009). The respondent in such proceedings is again the Commonwealth, now in the instantiation of the department of correction, whose lawyers defend against such petitions.

In both initial commitment proceedings, and petitions for release, QEs play a statutorily required role. In an initial proceeding, the first petition results in a probable cause

hearing.  If probable cause is found, the individual must be sent to the treatment center for up to sixty days for examination by two QEs.  After the QE examinations, the district attorney, or the Attorney General acting at the request of the district attorney, may petition the court for a trial to determine whether the individual should be committed as an SDP.  See G. L. c. 123A, § 14.  In a petition for release, "the judge 'shall order the petitioner to be examined by two qualified examiners, who shall conduct examinations, including personal interviews, of the person on whose behalf such petition is filed and file with the court written reports of their examinations and diagnoses, and their recommendations for the disposition of such person.'"  Johnstone, 453 Mass. at 548, quoting G. L. c. 123A, § 9.

In essence the QEs act as expert witnesses.  They are required in all SDP cases to prepare a report, which is made admissible by statute.  See In re McHoul, 445 Mass. 143, 148 n.4 (2005) ("Although [G. L. c. 123A, §§ 9 and 14(c)] makes the qualified examiner's report admissible, . . . the qualified examiner's report functioned as the equivalent of an expert witness's direct testimony").  If the Commonwealth decides to go forward with an initial commitment trial after the QE examinations, it cannot sustain its burden of proof unless one of the QEs has opined that the individual is an SDP.  Likewise

3

in a case involving a petition for release. See Johnstone, 453 Mass. at 553 ("[I]n order for the Commonwealth to proceed to trial in a discharge proceeding under G. L. c. 123A, § 9, at least one of the two qualified examiners must opine that the petitioner remains sexually dangerous. If neither of the qualified examiners is of the opinion that the petitioner is currently a sexually dangerous person, the Commonwealth cannot rely upon other sources of potential expert evidence . . . to meet its burden of proof at trial. . . . [T]he same reasoning applies as well to initial commitment proceedings brought pursuant to G. L. c. 123A, § 12 (b)").

The two QEs in each case are designated by the Commonwealth, from a list of individuals approved by the Commissioner of Correction, an Executive Branch official. "The QEs in each particular case are selected by the Department of Correction (department), chosen from the pool of those designated by the Commissioner of Correction (commissioner) under the statute." In re Santos, 78 Mass. App. Ct. 280, 282 (2010). The department of correction is a commission within the Executive Office of Public Safety and Security; the Commissioner is appointed by the Secretary of Public Safety, a political appointee of the Governor, only with the Governor's approval. See G. L. c. 123A, § 1, amended by St. 1993, c. 489, § 1; G. L. c. 27, § 1.

4

The department of correction also pays the QEs' compensation. The statute provides that: "A 'qualified examiner' need not be an employee of the department of correction or of any facility or institution of the department," see G. L. c. 123A, § 1, and under department of corrections policy, 103 Department of Correction regulations (DOC) § 458 (2021), "QUALIFIED EXAMINER EVALUATIONS PURSUANT TO M.G.L. c. 123A," it appears that all QEs are currently provided to the department by contractors. See id. § 458.03. At the time of Santos, "[q]ualified examiners [were] provided to the Commonwealth by a for-profit corporation, Forensic Health Services, Inc., a vendor that operates under a contract with the department for the provision of such examiners and that also holds contracts with the department to provide a wide range of other services. See, e.g., Johnstone, petitioner, 72 Mass. App. Ct. 123, 124 n.3 (2008), S.C., 453 Mass. 544 (2009); Massachusetts Department of Correction, Program Description Booklet at 44 (June 2008)." Santos, 78 Mass. App. Ct. at 282 n.2. And in In re Edwards, 464 Mass. 454, 457 (2013), the Supreme Judicial Court noted that the department of correction paid compensation "to Forensic Health Services, Inc. (FHS), for a qualified examiner's evaluation and written report . . . and testimony . . . which is greater than the amount the qualified examiners themselves receive." In testimony from a trial in

5

another case that Joss has acknowledged before us, Joss testified, consistent with this, "When a decision is made to hold a person for an evaluation [in an SDP proceeding,] the Court notifies the Department of Corrections and the Department of Corrections has a contract with an entity that sort of supplies the qualified examiners. Despite the fact that we're all designated by the Department of Corrections, we are actually paid by the contractor."

Facts. Turning to the facts of this case, on June 19, 2018, the district attorney filed a petition under G. L. c. 123A, § 12, alleging that Mackie, an individual incarcerated for sexual offenses, was an SDP as defined by the statute. The trial court determined that there was probable cause to believe that Mackie was an SDP and ordered that Mackie be committed for a period not exceeding sixty days for the purpose of examination and diagnosis under the supervision of two QEs, as required by G. L. c. 123A, § 13 (a). The department of correction chose Joss as one of the two QEs under G. L. c. 123, § 13 (a), to examine Mackie, and to file the report required by statute. Joss did interview Mackie and wrote and submitted to the court a report stating that Mackie met the diagnostic criteria for pedophilic disorder. The district attorney moved for a trial, in accordance with G. L. c. 123A, § 14, to determine whether Mackie was an SDP. A jury trial was held at which the district

6

attorney called Joss to testify.  Joss testified that Mackie met

the Diagnostic and Statistical Manual of Mental Disorders, Fifth

Edition (DSM-5), diagnostic criteria for pedophilic disorder.

Mackie was found to be an SDP, a ruling that was reversed

by the Appeals Court due to the improper introduction of

"allegations that [Mackie] had committed various sexual offenses

of which he never was convicted."  Commonwealth v. Mackie, 100

Mass. App. Ct. 78, 79 (2021).  Eventually, on the basis of

alleged inconsistencies and errors in the report and testimony,

including an alleged "failure to comply with specifically

detailed diagnostic criteria contained in the DSM-5 manual

related to Pedophilic Disorders," Mackie brought this suit

against Joss alleging violations of 42 U.S.C. § 1983, the

Massachusetts Civil Rights Act, G. L. c. 12, § 11I, medical

malpractice, violations arising from Joss's "failure to comply

with . . . Statutory criteria" in G. L. c. 123A, § 1, and

violations of his "enjoyment of liberty," "pursuant to the

Massachusetts Declaration of Rights, Art. X."

Joss filed a motion to dismiss, arguing in his memorandum

in support of that motion that he was entitled to qualified

immunity.  Mackie filed a written opposition arguing, inter

alia, that as a private person, not a government official, Joss

was not entitled to qualified immunity.  At the hearing on the

7

motion, Joss for the first time raised a claim of quasi-judicial absolute immunity.[1]

In her ruling on the motion, the judge held that that because he is a private party, "it does not appear that Dr. Joss is entitled to qualified immunity." She held nonetheless that the complaint must be dismissed because Joss had absolute quasi-judicial immunity, because QEs play "a unique and central role . . . in sexually dangerous commitment proceedings," "perform[s] essential judicial functions," "are an integral part of the judicial process," and "perform[] a function with an essential connection to the judicial process." The judge also placed a footnote at the end of the opinion stating, "In addition, it appears that Dr. Joss' statements in the SDP probable cause hearing and jury trial are protected by the litigation privilege," raising that privilege sua sponte. Mackie has appealed.

---

[1] The verified complaint states Mackie was suing Joss in both his individual capacity and "in any official capacity he may be entitled to." "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity" "of which an officer is an agent," Kentucky v. Graham, 473 U.S. 159, 165-166 (1985). Mackie does not mention in his brief that Joss was sued in any but his individual capacity, and makes no argument about immunity based on the suit having named Joss not only in his individual capacity, but in any official capacity to which he was entitled. We therefore express no opinion on the matter.

8

Discussion.  Our review of allowance of a motion to dismiss under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), is "de novo, accepting as true all well-pleaded facts alleged in the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor, and determining whether the allegations plausibly suggest that the plaintiff is entitled to relief." Lanier v. President & Fellows of Harvard College, 490 Mass. 37, 43 (2022).

Turning first to quasi-judicial immunity, we agree with Mackie that it is not applicable here.  Joss argues that QEs are quasi-judicial actors because, though not judges themselves, they "perform essential judicial functions."  He argues that it does not matter that they are not appointed by the court because they are appointed by "an arm of the court," and act as an integral part of the judicial process.

QEs, however, are not appointed by an arm of the court. They are appointed by one of the parties, the Commonwealth (indeed by the very agency that litigates SDP petitions under Section 9), from a list including only individuals approved by the Commissioner.  In this they differ from appointees of the probation department.  The probation department is "a division of the judicial branch." Commonwealth v. Milton, 427 Mass. 18, 20 (1998).  This serves to distinguish LaLonde v. Eissner, 405 Mass. 207, 213 (1989), on which Joss would rely, in which quasi-

9

judicial immunity was given to a court-appointed psychiatrist who was "not specifically designated by the judge's order, but rather by the probation department acting pursuant to a court order" as part of a court-ordered investigation by the probation department related to a child visitation matter before the court.

As Joss notes, "Massachusetts uses a functional analysis when determining whether an individual performs a quasi judicial function and is therefore entitled to absolute immunity." Hornibrook v. Richard, 488 Mass. 74, 79 (2021).  But QEs do not perform judicial functions; they could not given their eligibility and selection are determined by one of the parties before the court.  They act essentially as expert witnesses designated by the Commonwealth.  QEs do have some independence in that they are free to reach any conclusion after their investigation,[2] but they are designated and paid by the Commonwealth.[3]

_____

[2] This perhaps explains the dictum in In re Chapman, 482 Mass. 293, 303 (2019), where the Court said, "an expert who serves as a [QE] is recognized to be independent and to serve as though appointed by a court."

[3] Since the department of correction is itself the very agency of the Commonwealth that is the respondent in § 9 proceedings like the one in In re Chapman, supra, and that litigates them, the Court's dictum there that "[t]he qualified examiners . . . are not retained by, paid by, or beholden to any party," must either mean only that the direct payor of the QEs is the contractor working for the department, or be in error.

Because the Commonwealth essentially prosecutes and defends SDP actions, the only type of absolute quasi-judicial immunity to which QEs might be entitled is the absolute prosecutorial immunity, that, we will assume for present purposes only, belongs to the office that hired them.  Indeed, the other factors identified by the motion judge -- "a unique and central role . . . in [judicial] proceedings," being "an integral part of the judicial process," and "performing a function with an essential connection to the judicial process" -- could be said of all expert witnesses chosen by the government.

Prosecutors do have "quasi-judicial" absolute prosecutorial immunity in some circumstances.  Other executive branch officials exercising executive functions have, at most, only qualified immunity.  Joss does argue that because QEs "perform a 'gatekeeper role' in the statutory scheme to civilly commit and/or discharge individuals under G. L. c. 123A," they are entitled to absolute immunity.  Prosecutors, however, are entitled to absolute immunity only when they undertake tasks in their prosecutorial capacity, not when they act as witnesses, even as complaining witnesses.  See Kalina v. Fletcher, 522 U.S. 118, 129 (1997).  Joss was an investigator and a witness.  To be sure, QEs are required witnesses, and if neither of them testifies that an individual is an SDP, he cannot be found to be one.  See Johnstone, 453 Mass. at 552-553 ("Implicit in this

11

view is the conclusion that, if both qualified examiners determine that a person is not sexually dangerous, the Commonwealth cannot meet its burden of proof. . . . Because our decision is based on the integral role of the qualified examiners in the entire statutory scheme, the same reasoning applies as well to initial commitment proceedings brought pursuant to G. L. c. 123A, § 12 (b)"). But we think that statutory role makes them at most analogous to a complaining witness. Thus, even were Joss entitled to the immunity given to prosecutors, a question on which we express no opinion, he would not be entitled to absolute immunity.

Joss is, however, entitled to qualified immunity. The judge, understandably, stated that it did not appear that he was. Mackie included detailed argument in his memorandum in the trial court citing cases in which private individuals have been held not eligible for qualified immunity. Joss's attorneys inexplicably failed even to address that question either in response in the trial court, or, indeed, before us. Nonetheless, in light of the Supreme Court's latest word on the subject in the context of § 1983 in Filarsky v. Delia, 566 U.S. 377, 393-394 (2012), we conclude that Joss, even if he is understood to be a private individual, is entitled to qualified immunity. Mackie does not argue that the common-law immunity with respect to his other claims differs from that under § 1983.

12

The question, then, is whether Mackie has alleged any violation of "clearly established statutory or constitutional rights of which a reasonable person would have known." See Rodriques v. Furtado, 410 Mass. 878, 882 (1991), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In this case, unlike Rouse-Weir, because of the way in which the case was decided, the motion judge did not reach that question. We think the prudent course, therefore, rather than parsing all the allegations of the complaint in the first instance here on appeal, is to remand the case to the trial court for consideration of that question in the first instance. Our decision in Rouse-Weir may provide some useful guidelines. The order of dismissal therefore is vacated and the case remanded

for further proceedings consistent with this memorandum and order.[4]

> So ordered.
>
> By the Court (Rubin,
>   Wolohojian & Brennan, JJ.[5]),
>
> *Joseph F. Stanton*
>
> Clerk

Entered:  July 31, 2023.

---

[4] The judge sua sponte raised the issue of litigation privilege. Without expressing any opinion as to whether the privilege may or may not apply to this case, we note that the issue could not properly have been decided without briefing and factual development, which did not (and could not) occur in the context of Joss's motion to dismiss.  Therefore, the judge's ruling regarding the litigation privilege is vacated without prejudice to further consideration, after briefing and factual development, on remand.

[5] The panelists are listed in order of seniority.